## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **TYRELL WATKINS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 3:17-cv-00060-GCS** |
| | ) | |
| **CAROL FAIRLESS,** | ) | |
| **RON WHITE,** | ) | |
| **ADAM HENDERSON, and** | ) | |
| **COLE CARTER** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM & ORDER

**SISON, Magistrate Judge:**

This matter is before the Court for determination of the amount to award Plaintiff Tyrell Watkins in attorneys' fees imposed as a sanction by then-presiding United States Magistrate Judge Stephen C. Williams. The attorneys' fees were awarded as a result of the failure by certain Defendants to disclose or supplement records produced during discovery in violation of Federal Rule of Civil Procedure 37(c). Plaintiff's counsel, in a series of exhibits and affidavits, requests that the Court award $532,952.00 in attorneys' fees and $57,522.61 in expenses for Defendants' discovery violations. Defendants raise a number of objections.

The Court also considers Defendants' contested bill of costs (Doc. 203). Defendants, as the prevailing parties in this action, seek reimbursement of $2,575.25 in costs, but Watkins raises several objections (Doc. 206). After careful and thorough review of the billing records of counsel and the briefs submitted by the parties on both issues,

the Court awards in part the costs sought by Watkins and awards in part those sought by Defendants.

FACTUAL AND PROCEDURAL BACKGROUND

On January 20, 2017, Watkins, who had been released from incarceration, filed suit against Wexford Health Sources, Inc., Unknown Employees of Wexford Health Sources, Inc., Unknown Police Officers at Vienna Correctional Center ("Vienna"), and the Illinois Department of Corrections ("IDOC"). Watkins alleged that the Defendants violated his constitutional rights by preventing him from obtaining necessary medical care when he dropped a weight on himself while incarcerated at Vienna in 2015. He alleged that the lack of appropriate medical treatment led to him having his testicle removed, a consequence he could have avoided but for Defendants' actions. His initial complaint brought four claims: deliberate indifference claims against the unknown officers (Count 1) and the unknown Wexford employees (Count 3) and claims of unconstitutional policies and practices against IDOC (Count 2) and Wexford (Count 4).

The parties engaged in discovery, and, at an April 18, 2017 status conference, they advised Magistrate Judge Stephen C. Williams that they had identified all of the John Doe defendants except for one sergeant. The parties also represented that Watkins had provided enough information to narrow down a specific date when the John Doe sergeant was working. (Doc. 38). Defendants provided information, including photographs, to Watkins, and Watkins filed an amended complaint on April 27, 2017, without any John Doe defendants named. His claims related to the sergeant, later determined to be a "white shirt" (i.e., a lieutenant), went by the wayside due to the

inability to identify him. The remaining John Doe correctional officers were identified as Cole Carter, Adam Henderson, and Ron White. (*See* Doc. 39, 40, 42).

According to the amended complaint (Doc. 42), a weight fell on Watkins's stomach while he was exercising on April 26, 2015. He told Henderson about his pain right away. Henderson observed Watkins throwing up on May 2, 2015, and he called the incident in over his radio. Watkins was taken to the healthcare unit where various healthcare defendants, including Dr. Dennis Larson, examined him and wrongly diagnosed him as having the stomach flu.

Watkins was returned to his cell on May 3, 2015, and he went to sleep. When he woke up, he went to the restroom and noticed that one of his testicles was larger than the other. He then notified the defendants then-identified as Henderson, White, and Carter, among others, but the officers took no actions to help him. Watkins alleged that he was told it was not an emergency and that if he went to the healthcare unit and the nurse agreed it was not emergent, then Watkins would be sent to segregation.

Watkins began writing grievances in an to attempt to get treatment. He was scheduled to see a doctor on May 4, 2015, but he was told to reschedule when he arrived for the appointment. He went back to the healthcare unit on May 8, 2015, where he was eventually seen by Carol Fairless, one of the previously-unknown Wexford defendants. Fairless contacted Dr. Larson, and Dr. Larson told her to hold Watkins overnight for observation.

Two nurses examined Watkins the next day. They decided to send him to the emergency room because his condition could be life threatening. At the hospital, a nurse

performed an ultrasound of Watkins's testicle, and he was seen by Dr. Robert L. Hatchett. Dr. Hatchett told Watkins that there was no blood circulation to his testicles and that his testicle needed to be removed. He also allegedly told Watkins that the testicle could have been saved if Watkins received treatment sooner. Upon release from IDOC, Watkins retained counsel to file suit for cruel and unusual punishment during his incarceration.

In the course of identifying the John Doe IDOC employees for the amended complaint, two serious problems arose unbeknownst to Watkins or his counsel. First, the IDOC defendants produced a duty roster in July 2017 and represented that it was the roster that showed the duty stations of various employees during May 2015 when Watkins's injuries occurred. Next, during depositions in October 2017, including the deposition of Defendant Carter, Defendants and their counsel represented to Watkins and his counsel that there were no logbooks available to disclose. Watkins also was told that Vienna had a one-year retention policy, so any logs from 2015 that once existed were no longer available.

Based on the documents and information from the IDOC correctional officer defendants, Defendants Carter, Henderson, and White were named as the unknown correctional officers. Any attempts to identify the "white shirt" John Doe seemingly were abandoned. Watkins relied on the master roster to attempt to identify John Doe IDOC employees and to assure himself he had named the correct parties. However, it eventually came to light that the roster actually showed the duty stations of various employees on the day it was printed in July 2017 rather than in May 2015, making it worthless in terms of identifying unknown parties.

The case proceeded through discovery, and Watkins's claims against Dr. Larson, Adam Henderson, Cole Carter, Ron White, Tracie Stanford, and Carole Fairless survived summary judgment.[1] The first trial began on June 26, 2018. Watkins and Dr. Larson reached a settlement before trial, so only the IDOC defendants remained. On the second day of trial, Defendant Carter brought in a previously undisclosed timesheet showing that he was not working on the day Watkins's claims against him arose. The new timesheet created confusion as to whether the July 2017 printout was accurate (its inaccuracy had yet to be uncovered) or whether the timesheet was wrong. The timesheet was not allowed into evidence. The jury was unable to reach a unanimous verdict, and Judge Williams declared a mistrial on June 29, 2018. Trial was reset for November 13, 2018. (Doc. 151).

On November 8, 2018, Judge Williams held a hearing on a discovery dispute related to the production of a new exhibit by Defendants shortly before the second trial was set to begin. Days before trial, Defendant Carter produced to defense counsel another new document, a "cleaning cycle log." The log provided the identity of the unidentified John Doe lieutenant that Watkins sought to identify earlier in the litigation. However, the Defendants and defense counsel had previously and affirmatively represented that no logs existed due to the purported retention policy at Vienna. During the first trial, it became clear that the master roster was misleading, and, at the discovery hearing, counsel conceded that it was inaccurate because it provided locations of various officers on the

---

[1]     There is no indication that any Defendants, other than Cole Carter, were misidentified.

date it was printed in July 2017, as opposed to the dates of the occurrences in this action, *i.e.*, May 2015.

With respect to the newly discovered evidence and the errors in the duty roster, Judge Williams found that the information was significant in that it would have identified the correct Defendant and would have exonerated Defendant Carter much earlier in the litigation. Watkins sought an adverse inference about the missing lieutenant's testimony, and the Court found that such an inference was warranted. Judge Williams also scheduled a follow-up hearing to determine what went wrong during discovery regarding the undisclosed documents and the misleading information that was supplied. (Doc. 175).

Following a show cause hearing on November 29, 2018, Judge Williams issued an order detailing his findings with respect to the discovery violations. (Doc. 195). He rejected Defendants' arguments that IDOC provided the misleading documents and information and that Defendants were not responsible for the errors and omissions. At the hearing, Defendants' witness, Carrie Sisk, the litigation coordinator at Vienna, claimed that she heard about the purported one-year retention policy from the Major's secretary, but no other information supporting its existence was provided. Judge Williams ultimately found that either the Major's office at Vienna was grossly negligent in producing documents to Defendants and defense counsel or that the records were kept for longer than one year. The alternative led Judge Williams to suggest that the Major's office relied on a fictional one-year retention policy to avoid searching for documents until it was convenient or helpful to the office, or, presumably, to Vienna employees.

Judge Williams also took issue with failings on the part of defense counsel. He found that defense counsel was in possession of Defendants' timesheets in July 2017, but the timesheets were not produced until the hearings in November 2018. The exception was the timesheets of Carter, which Carter brought to the first trial himself. Judge Williams also found that defense counsel was given an affirmative statement from the litigation coordinator in October 2017 that there was no lockdown or medical emergency at Vienna on May 7, 2015. During the first trial, defense counsel elicited testimony that a lockdown or medical emergency could have caused the delay in Watkins's treatment. However, in light of the aforementioned information, counsel clearly lacked a good faith basis for eliciting such testimony.

Judge Williams ultimately concluded that from the time Watkins's counsel was provided with the inaccurate duty roster through the second trial, both Watkins's counsel and the Court "were chasing their tails over these issues and expending additional time and resources that could have been used elsewhere." (Doc. 195, p. 7). He laid the blame squarely on the Major's office at Vienna and on defense counsel, including counsel from the first trial. While the Court gave an adverse inference during the second trial, Judge Williams found that remedy insufficient to address the prejudice that accrued beginning with the disclosure of the inaccurate roster in July 2017 and continuing until the disclosure of the "cleaning cycle log" in November 2018. As a sanction, Judge Williams awarded "attorney's fees from August 15, 2017, the date that Watkins's counsel received the July 2017 roster, through November 7, 2018." He also awarded "attorney's fees for

the time spent preparing for the November 29, 2018 hearing." (Doc. 195, p. 9). The specific amount of the applicable sanction is now before the Court.

ANALYSIS

## 1. Limits to the Temporal Award of Fees and Costs

The Court begins by addressing whether the sanction ordered by Judge Williams should be limited in any way, which Defendants argue for in their opposition to Watkins's fee petition. While the Court previously denied Defendants' motion for reconsideration, the undersigned still must weigh whether the sanction ordered is appropriate under the applicable law before imposing it.

The undersigned will not set aside the decision to award reasonable costs, including attorney's fees, in response to Defendants' misconduct. Judge Williams, who presided over the discovery process and the two trials in this action for nearly two years, found that, with respect to the identification of the IDOC defendants, Watkins's counsel engaged in a losing battle from the moment the inaccurate information and documents were provided by the IDOC defendants. This resulted in Watkins's counsel spinning their wheels and wasting their time. He noted that the timesheets, which were not produced until November 2018, were available to Defendants in July 2017 but were not disclosed. Judge Williams also expressly ruled that the adverse inference was insufficient to rectify the discovery failures by Defendants.

These findings are particularly true when the undisclosed information likely would have led to an earlier dismissal of Defendant Carter and could have led to discovery of the identity of the unidentified "white shirt," even if the white shirt may

have had his involvement limited to that of a witness due to statute of limitations issues. Watkins's case, at least to some degree, was hobbled by Defendants' actions, which Judge Williams recognized. Watkins's counsel engaged in extra work and incurred fees and costs attributable to Defendants' failures to disclose information as required. Some monetary award for the wasted time is appropriate.

In earlier briefing, Defendants maintain that they were not responsible for alleged failures by the IDOC litigation coordinator or the Major's office at Vienna in producing inaccurate or incomplete information. Like Judge Williams, the undersigned is unpersuaded by that line of reasoning. In weighing the question of when agents could be compelled to produce documents in discovery, the Seventh Circuit considers whether a party has sufficient control over the documents. *See Thermal Design, Inc. v. American Society of Heating, Refrigerating and Air-Conditioning*, 755 F.3d 832, 838-839 (7th Cir. 2014)(citing *Dexia Credit Local v. Rogan*, 231 F.R.D. 538, 542 (N.D. Ill. 2004)(noting that on the issue of control, "the test is whether the party has a legal right to obtain [the evidence].")(quotation marks omitted)). Here, Defendants retrieved the documents as needed without any evidence of pushback or difficulty. Defendant Carter personally provided his timesheet to defense counsel, and he produced the cleaning cycle log to defense counsel. Nothing suggests to the undersigned that Judge Williams's conclusion that Defendants are responsible for the discovery violations was erroneous.

In affirming Judge Williams decision to award attorneys' fees in response to Defendants' discovery violations, the Court notes that Watkins asked for a new trial, but the request was denied because, while there were disputes of fact to survive summary

judgment, Watkins had his day in court against Defendants White, Henderson, Fairless, and Stanford. A new trial would not address the elephant in the room, *i.e.*, that Defendant Carter was misidentified and that Defendants ducked and obfuscated such that the John Doe lieutenant's identity was not known in time for Watkins to file suit against him or to seek information about him in discovery. At this point, it likely was too late to attempt to vindicate Watkins's claims from 2015 against the lieutenant or the unknown officer incorrectly named as Cole Carter. Similarly, an adverse inference, while certainly warranted, did not rectify fully the prejudice caused by the discovery misconduct in this action.

Having carefully considered the record, the undersigned concludes that there has been a discovery violation by Defendants and defense counsel that warrants the imposition of sanctions. The offending conduct includes not only the failures to disclose pertinent information, but also the disturbing fact that defense counsel elicited testimony about a possible lockdown during the first trial while affirmatively knowing there was not one. When considering the record as a whole, there is evidence of bad faith by the IDOC defense that warrants monetary sanctions. As an adverse inference was appropriate but not sufficient and a new trial is not warranted, an award of reasonable costs, including attorneys' fees, is left as the reasonable and appropriate sanction in this action.

That said, the temporal limits that Judge Williams used to determine the scope of the fee award cannot be imposed. In considering the amount of fees to award, the Court looks to *Goodyear Tire & Rubber Co. v. Haeger*, 137 S.Ct. 1178 (2017). In *Goodyear*, the

Supreme Court considered a "federal court's authority to sanction a litigant for bad-faith conduct by ordering it to pay the other side's legal fees." *Id.* at 1183-84. The Court held "that such an order is limited to the fees that the innocent party incurred solely because of the misconduct – or put another way, to the fees that party would not have incurred but for the bad faith." *Id.* at 1184. Sanctions imposed for discovery violations "must be compensatory rather than punitive in nature." *Id.* at 1186 (citing *Int'l Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 826-830 (1994)). Essentially, compensating a party for fees incurred due to misconduct is permissible, but any sanction imposed beyond that becomes punitive and may require criminal-type procedural guarantees. *Id.* at 1186.

Courts fashioning fee awards must award only those fees with a "causal link" between a party's "misbehavior and legal fees paid by the opposing party" using a "but-for test." *Goodyear*, 137 S.Ct. at 1186-87. The but-for standard allows courts to "exercise discretion and judgment" in "assess[ing] and allocat[ing] specific litigation expenses," but the Supreme Court instructs that a "court's fundamental job is to determine whether a given legal fee – say, for taking a deposition or drafting a motion – would or would not have been incurred in the absence of the sanctioned conduct." *Id.* at 1187. In pursuit of an appropriate fee award, courts "may use estimates in calculating and allocating an attorney's time." *Id.* (quoting *Fox v. Vice*, 563 U.S. 826, 838 (2011)).

Not all fees and costs expended by Watkins's counsel from the August 2017 date the inaccurate roster was first turned over, or the date in July 2017 when the timesheets were received and withheld, share a causal link with the discovery violations. As such,

there is not adequate cause to employ a temporal limit in this action. Applying the but-for standard, discovery and attorney hours expended as to Defendant Carter share a causal link with Defendants' discovery violations. Likewise, time spent by Watkins's counsel examining the inaccurate roster, attempting to identify the "white shirt," and dealing with the late disclosure of the cleaning cycle logs and timesheets, including the discovery dispute and show cause hearings, are sufficiently tied to Defendants' actions.

The Court finds these limits are appropriate because the remaining discovery and depositions related to other defendants would have occurred despite the sanctioned discovery misconduct. For example, the parties still would have litigated summary judgment motions. They would have appeared for the summary judgment motion hearing, and they would have prepared for and appeared at both trials. Accordingly, the Court finds that the proper sanction should include only the fees and costs discussed above that are associated with Defendant Carter and the inaccurate, misleading discovery disclosures.

## 2.   Lodestar Analysis

To calculate attorneys' fees, the district court generally begins with the "lodestar," *i.e.*, the product of the hours reasonably expended on the case multiplied by a reasonable hourly rate. *See Montanez v. Simon*, 755 F.3d 547, 553 (7th Cir. 2014). "The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed[]" in support of the lodestar. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). "Although lodestar yields a presumptively reasonable fee . . . the court may nevertheless adjust the fee based on factors not included in the computation[.]" *Montanez*, 755 F.3d at

553. Such factors can include the time and labor required, the novelty or difficulty of the case, the degree of success achieved, the experience and ability of the attorneys, the adequacy of the documentation of the hours, and whether appropriate billing judgment was used. *See Hensley*, 461 U.S. at 430, 430 n.4.

### a.   Adjustments to the Hours of Watkins's Counsel

As discussed above, the Court is limiting the award of fees to work expended on discovery related to Defendant Carter, the inaccurate master roster, the "white shirt" identification, and the hearings related to the discovery violations and sanctions in November 2018. Watkins's counsel submitted a 53-page document listing their hours between August 15, 2017, and December 3, 2018. Though the document requests an award for approximately 1,561 hours of work billed at various rates, the Court has carefully reviewed the billing records to identify those entries associated with the fees that will be imposed.

The hours worked component of the lodestar must exclude hours not reasonably expended, including "excessive, redundant, or otherwise unnecessary" hours. *Hensley*, 461 U.S. at 434. In determining whether hours are reasonable, the Court must determine whether the task would normally be billed to a paying client and whether certain tasks could easily be delegated to non-professional assistants. *See Spegon v. Catholic Bishop of Chicago*, 175 F.3d 544, 533 (7th Cir. 1999). The Court may also reduce the hours calculation "[w]here the documentation of hours is inadequate[.]" *Hensley*, 461 U.S. at 433.

The Court, in reviewing the bills, notes that certain records involving Defendant Carter by name also involved other defendants. With respect to those time entries, where

they are adequately documented to identify that the work was tied to Defendant Carter, the Court will reduce the hours expended by two-thirds to reflect that not all of the time spent on the activity shares a but-for link with Defendants' conduct. The two-thirds figure was reached by examining the entries and concluding that they involved either Carter plus two other individuals or Carter plus three other individuals.

With respect to Attorney Avi Kamionski's billing records, the entries that fall within the above-described categories, without being entries that involved Carter in addition to other defendants, are as follows:

| Date | Description | Time |
|------|-------------|------|
| 11/6/17 | Review and analyze master roster produced by IDOC | 1.00 |
| 3/20/18 | Review emails and correspondence re: "white shirt" identification | 1.60 |
| 11/7/18 | Review dep of Cole Carter and strategize for examination at trial | 2.5 |
| 11/8/18 | Review cleaning cycle disclosure and strategize on how to deal with it | 1.5 |
| 11/8/18 | Conf with Lisa Cook re: cleaning cycle disclosure | 0.5 |
| 11/8/18 | Conf with Natalie re: cleaning cycle disclosure and prep for hearing | 1.0 |
| 11/8/18 | Attend via telephone hearing with the Court | 1.5 |
| 11/8/18 | Research discovery (including documents and depositions) for request for sergeant and white shirt | 3.0 |
| 11/8/18 | Conf with Shneur and Natalie re: strategize on remedy for late cleaning cycle disclosure | 1.5 |
| 11/13/18 | Prep for examination of Cole Carter re: cleaning cycle log | 2.0 |
| 11/13/18 | At[t]end court for Carter examination of cleaning cycle log issue | 4.0 |

| 11/16/18 | Conf with Shneur re: strategize on show cause hearing | 1.0 |
| 11/28/18 | Conf with Shneur re: prep for rule to show cause hearing | 1.0 |
| 11/28/18 | Review relevant discovery materials (written discovery and past emails to opposing counsel re: white shirt) | 2.0 |
| 11/29/18 | Attend rule to show cause hearing by phone including making argument | 4.0 |
| **Total Hours** | | **28.1** |

The following billing entries explicitly involved Defendant Carter along with other defendants:

| Date | Description | Time |
| --- | --- | --- |
| 10/21/17 | Revi[e]w outlines and prep for depositions of Darlene Winters, Pam Franklin, and Cole Carter | 3.0 |
| 10/22/17 | Continued prep for depositions of Darlene Winters, Pam Franklin and Cole Carter | 3.0 |
| 10/25/17 | Take Deposition of Darlene Winters, Cole Carter, Pam Franklin and Darla Lingle | 8.0 |
| 11/11/17 | Review and analyze depositions of defendants Carter, Lingle and Franklin | 4.0 |
| **Total Hours:** | | 18.0 |
| **Reduced by 2/3:** | | **6.0** |

Based upon a thorough review of Attorney Kamionski's billing records, the Court finds that his hours are adequately documented and clearly related to Defendants' discovery violation and amount to a total of 34.1 hours.

A similar review of Attorney Shneur Nathan's billing records demonstrates the following billing entries have a sufficient causal link to Defendants' discovery violations:

| Date | Description | Time |
|------|-------------|------|
| 6/20/18 | Review and analyze deposition of CO Carter | 1.2 |
| 6/21/18 | Draft cross-examination of Cole Carter | 1.5 |
| 11/8/18 | Conf with Natalie re: strategize on remedy for late cleaning cycle disclosure | 1.5 |
| 11/8/18 | Conf with Avi and Natalie and Chris re: strategy for trial with adverse inference instruction | 1.3 |
| 11/13/18 | Prep for examination of Cole Carter re: cleaning cycle log | 2.0 |
| 11/13/18 | At[t]end court for Carter examination on cleaning cycle log | 4.0 |
| 11/28/18 | Review and analyze relevant discovery materials (written discovery and past emails re: "white shirt") and notes as relevant to rule to show cause hearing | 2.0 |
| 11/29/18 | Attended show cause hearing including making argument and examining witness | 4.0 |
| 12/3/18 | Edit affidavits for fees for Avi, Natalie, Helen and myself | 1.8 |
| **Total Hours:** | | **19.3** |

Attorney Nathan also had billing entries that clearly involved Carter in addition to other defendants, but the two entries were for cross-examination points for all correctional officers in June 2018. There's nothing to suggest that time would not have been expended had Carter not been a party at that time. As such, the Court finds that Attorney Nathan's hours attributable to Defendants' discovery violations amount to 19.3 hours.

Attorney Natalie Adeeyo's billing records reflect no time entries that would not have occurred but for Defendants' violations until November 2018, except for one from March 5, 2018. Upon careful review, the Court awards fees as to Attorney Adeeyo for the following entries:

| Date | Description | Time |
|---|---|---|
| 3/5/18 | Reviewed and analyzed Cole Carter deposition for summary judgment response | 0.8 |
| 11/7/18 | Reviewed and analyzed cleaning cycle logs produced by Defendants | 0.2 |
| 11/8/18 | Reviewed and analyzed Pinex v. City of Chicago regarding late discovery production, sanctions, and adverse inference instructions | 0.4 |
| 11/8/18 | Conf with Avi re: cleaning cycle disclosure and prep for hearing | 1.0 |
| 11/8/18 | Attend via telephone hearing re: cleaning cycle log with the court | 1.5 |
| 11/8/18 | Conf with Shneur and Avi re: strategize on remedy for late cleaning cycle disclosure | 1.5 |
| 11/8/18 | Conf with Shneur and Natalie and Chris re: strategy for trial with adverse inference instruction | 1.3 |
| 11/13/18 | Prep for examination of Cole Carter re: cleaning cycle log | 2.0 |
| 11/13/18 | At[t]end court for Carter examination of cleaning cycle log issue | 4.0 |
| 11/27/18 | Talked to court deputy regarding appearance for upcoming show cause hearing | 0.1 |
| 11/27/18 | Talked to Avi regarding witness appearance at upcoming show cause hearing | 0.1 |
| 11/28/18 | Talked to Avi and Shneur regarding anticipated testimony of witness at show cause hearing | 0.1 |
| 11/29/18 | Reviewed and analyzed relevant discovery materials (written discovery and past emails re: white shirt) in preparation for show cause hearing | 0.5 |
| 11/29/18 | Reviewed and analyzed case law regarding sanctions for discovery violations | 0.5 |
| 11/29/18 | Attended show cause hearing and assist Shneur with arguments identifying key points and dates as needed to clarify argument | 4.0 |
| 11/29/18 | Drafted affidavit for fees | 0.3 |
| 11/30/18 | Reviewed and analyzed Avi, Shneur, Helen, Naima and my billed hours for the Watkins case to submit Plaintiff's fees | 4.0 |
| 11/30/18 | Drafted excel sheet listing plaintiff's attorney's fees and costs | 4.0 |
| 12/1/18 | Talked to Avi regarding statement of Plaintiff's attorneys' fees | 0.1 |

| 12/2/18 | Reviewed and analyzed Avi, Shneur, Helen, Naima and my billed hours to submit Plaintiff's fees | 0.4 |
| 12/2/18 | Drafted excel sheet listing plaintiff's attorney's fees and costs | 2.4 |
| 12/2/18 | Reviewed and revised affidavits to add in case law regarding hourly rates | 0.6 |
| 12/2/18 | Emailed Avi and Shneur regarding statement of Plaintiff's attorneys' fees and affidavits | 0.1 |
| **Total Hours:** | | **29.9** |

Based on the above, the Court finds the appropriate hours award for Attorney Adeeyo's work is 29.9 hours.

For Attorney Helen O'Shaughnessy, the Court identified two billing entries related to Carter in an acceptably detailed manner. Both entries involved the review of Carter's deposition on March 2, 2018, and together totaled 1.3 hours. None of the entries for Paralegal Naima Rahman-Barber's time satisfy the but-for standard in *Goodyear*, and her time will not be included in the sanction award. Entries not included in the above tables either were unrelated to Defendant Carter, were insufficiently documented, or would have occurred regardless of Defendants' misconduct.

Some of the above time entries are duplicative among the attorneys. Duplicative time that cannot be billed reasonably to a client also cannot be billed to an adversary through fee-shifting. *See Gibson v. City of Chicago*, 873 F.Supp.2d 975, 989 (N.D. Ill. 2012). Courts must scrutinize fee petitions carefully for duplicative time. *See Jardien v. Winston Network, Inc.*, 888 F.2d 1151, 1160 (7th Cir. 1989). However, two lawyers performing the same task does not necessarily require that the hours must be deducted. *See Tchemkou v.*

*Mukasey*, 517 F.3d 506, 511-512 (7th Cir. 2008). The Court focuses the inquiry on whether the time was "reasonably expended." *Id*.

Attorneys Kamionski, Nathan, and Adeeyo have identical time entries for several events in November 2018. All three attorneys billed for two hours of preparation time and a four-hour hearing on November 13, 2018. Similarly, Mr. Kamionski and Mr. Nathan billed for two hours of preparation time for attending the four-hour show cause hearing on November 29, 2018. Ms. Adeeyo also billed for the four-hour hearing, but she only billed for one hour of preparation time. Given the complicated, time-sensitive issues involved and the need to adapt to newly-discovered information during November 2018, the Court finds that these hours, though duplicative, were reasonably expended given the time restraints and high-stakes nature of the issue for Watkins.

For all these reasons, the Court will include the following hours in its lodestar calculation:

| Attorney | Hours Allowed |
|---|---|
| Avi Kamionski | 34.1 |
| Shneur Nathan | 19.3 |
| Natalie Adeeyo | 29.9 |
| Helen O'Shaughnessy | 1.3 |

### b.  Adjustments to Hourly Rates

Attorney Avi Kamionski provided an affidavit (Doc. 196-2) stating that he has been a licensed attorney since 2004. He began his career as an Assistant Corporation

Counsel for the City of Chicago where he represented police officers and the City in civil rights suits brought pursuant to 42 U.S.C. § 1983. He joined Hale Law LLC as an associate in 2008 and was made partner in 2011. There, Attorney Kamionski continued to focus on federal civil rights litigation. He has been attorney of record in 236 cases in the U.S. District Court for the Northern District of Illinois and has tried more than 25 jury trials in Illinois, focusing on cases with allegations of police misconduct. He also taught police misconduct litigation at Chicago-Kent College of Law for two semesters.

Shneur Nathan also submitted an affidavit (Doc. 196-3). He graduated from Chicago-Kent College of Law in 2007 and worked for the City of Chicago's Department of Law within a group called the Federal Civil Rights Litigation Division where he specialized in defending civil rights cases in federal court brought against police officers pursuant to 42 U.S.C. § 1983. He joined Hale Law LLC in 2010 and was made partner in 2014. He has handled hundreds of federal civil rights cases and tried approximately 20 to verdict.

Attorney Nathan and Attorney Kamionski formed Nathan and Kamionski LLP in 2017. (Doc. 196-2). One of the primary practice areas for the firm is federal civil rights cases. Neither Nathan nor Kamionski have ever submitted a fee petition to a court before, so their hourly rates have not been assessed in other proceedings. They each propose a $425.00 hourly rate after citing many cases awarding fees in the Northern District of Illinois. The Court has reviewed the cases cited in support of their hourly rate and notes that counsel accurately reported rates of between $400 and $550 in police misconduct cases litigated by attorneys of comparable experience in the Northern District of Illinois.

(*See* Doc. 196-2, p. 3). While this is persuasive, the question before the Court is what rate is market-appropriate in prisoner civil rights cases in or around the Southern District of Illinois.

Watkins's counsel did not submit affidavits from practitioners in or near the Southern District of Illinois to support their fee petition. Affidavits from other attorneys who practice in the local market can be of assistance to courts attempting to set an appropriate hourly rate. *See Eddleman v. Switchcraft, Inc.* 965 F.2d 422, 425 (7th Cir. 1992). In the absence of affidavits from local counsel, the Court looks to rates awarded in similar cases outside the Northern District of Illinois. For example, in December 2018, the Central District of Illinois awarded a rate of $360 per hour to a civil rights attorney who initially requested a $450 per hour rate. *See Norton v. City of Springfield*, No. 15-3276, 2018 WL 6601083, at *3 (C.D. Ill. Dec. 17, 2018). *But see Rasho v. Walker*, No. 07-1298, 2019 WL 8435472, at *7 (C.D. Ill. Feb. 26, 2019)(granting attorneys' request for hourly rate of $220.50 in a prisoner civil rights action where fee was limited by PLRA provisions). In this district, a Chicago-based civil rights attorney recently sought $450 per hour in a police misconduct case and saw her rate reduced 15% to $385 per hour. *See Capps v. Drake, et al.*, No. 14-cv-441-NJR-DGW, 2019 WL 859779, at *3 (S.D. Ill. Feb. 22, 2019).

In consideration of all of the above, the undersigned finds that approximately a 10 percent reduction to the rate requested by Attorneys Kamionski and Nathan is appropriate. While they are highly experienced, a rate of $425.00 per hour is a little high for the Southern District of Illinois. Accordingly, the Court will reduce the rate for Kamionski and Nathan to $385 per hour. The rates requested by attorneys Natalie

Adeeyo and Helen O'Shaughnessy likewise will be reduced proportionally from $200 for Attorney Adeeyo to $180 per hour and from $395 per hour for Attorney O'Shaughnessy to $355.00.[2] Both Adeeyo and O'Shaughnessy submitted affidavits in support of their requested fees, and their experience supports the rates set by the Court herein.

### c.   Lodestar Calculation[3]

For the reasons set forth above, the Court calculates the total lodestar as follows:

| Attorney | Hours Awarded | Rate Set | Total Fees |
|---|---|---|---|
| Avi Kamionski | 34.1 | $385 | $13,128.50 |
| Shneur Nathan | 19.3 | $385 | $7,430.50 |
| Natalie Adeeyo | 29.9 | $180 | $5,382.00 |
| Helen O'Shaugnessy | 1.3 | $355 | $461.50 |
| **Total Attorney's Fees** | | | **$26,402.50** |

### 3.   Watkins's Costs

In terms of the expenses and costs sought, for the reasons delineated above, the Court finds that only the costs of Carter's deposition and deposition transcripts satisfy the but-for standard as explained in *Goodyear*. The depositions of Defendants Lingle,

---

[2]      While the Court finds that Paralegal Naima Rahman-Barber did not have any billing entries with a causal link to Defendants' actions, a similar 10% reduction would have applied to her hourly rate, as well, if there were relevant litigation activities in her records.

[3]      Defendants raise no arguments for lodestar reductions due to Watkins's success or the novelty or difficulty of the case. Even if they had, the Court finds that this award is appropriate as a sanction for ongoing discovery and litigation misconduct and that it should not be reduced further under the lodestar analysis.

Winters, Franklin, and Carter were billed jointly at a total cost of $760.63. (Doc. 196-7, p. 4). The Court will award 25% of that cost, or $190.16, to Watkins. The expedited transcript orders for the first trial also appear sufficiently tied to dealing with the discovery violations because they led to the discovery of misleading statements by counsel during the first trial, one of the violations noted by Judge Williams, and because they involved Defendant Carter's testimony and helped shed light on the various discovery problems. The transcripts, along with their expedited transcript fees, cost $1369.45. The remaining costs, including depositions of other defendants and witnesses and an expert witness fee of nearly $50,000, do not have a causal link with Defendants' discovery violations. Accordingly, in total, the Court finds that Watkins is entitled to costs in the amount of $1,559.61.

### 4. Defendants' Bill of Costs

Defendants, as the prevailing parties, submitted a bill of costs seeking $2,575.25 for "fees and disbursements for printing." (Doc. 203). The costs include $1,905.70 for obtaining deposition transcripts and $669.55 for obtaining transcripts from the first trial. Watkins objects to Defendants' request, arguing that it was untimely and that Defendants' misconduct should negate any award of costs. Additionally, Watkins asks the Court not to impose costs due to his indigency.

As an initial matter, neither the Federal Rules of Civil Procedure nor this Court's local rules set a deadline for filing a bill of costs, so Watkins's suggestion that Defendants' filing was untimely is unpersuasive. Watkins suggests there is a 30-day deadline for filing a bill of costs, but that deadline appears to originate from the Local Rules in the Northern

District of Illinois as opposed to this Court's Local Rules. As such, it does not apply in this Court.

Federal Rule of Civil Procedure 54(d)(1) states: "[u]nless a federal statute, these rules, or a court order provides otherwise, costs – other than attorney's fees – should be allowed to the prevailing party." While there is a presumption that the losing party will pay costs, the Court has "discretion to direct otherwise." *Rivera v. City of Chicago*, 469 F.3d 631, 634 (7th Cir. 2006). Courts may consider a party's indigence when assigning costs. *Id.* at 634. The Court may also consider whether the prevailing party engaged in misconduct "worthy of a penalty" when deciding whether to allow costs. *Congregation of the Passion, Holy Cross Province v. Touche, Ross & Co.*, 854 F.2d 219, 222 (7th Cir. 1998).

The Seventh Circuit explained the required two-part inquiry before denying costs based on a plaintiff's indigency:

> First, the district court must make a threshold factual finding that the losing party is incapable of paying the court-imposed costs at this time or in the future. The burden is on the losing party to provide the district court with sufficient documentation to support such a finding. This documentation should include evidence in the form of an affidavit or other documentary evidence of both income and assets, as well as a schedule of expenses. Requiring a non-prevailing party to provide information about both income/assets and expenses will ensure that district courts have clear proof of the non-prevailing party's dire financial circumstances. Moreover, it will limit any incentive for litigants of modest means to portray themselves as indigent.
>
> Second, the district court should consider the amount of costs, the good faith of the losing party, and the closeness and difficulty of the issues raised by a case when using its discretion to deny costs. No one factor is determinative, but the district court should provide an explanation for its decision to award or deny costs.

> Though we decline to abolish the indigence exception, we note that the exception is a narrow one. Rule 54(d)(1) provides a presumption that costs are awarded to the prevailing party, and the burden is on the non-prevailing party to overcome this presumption.

*Rivera*, 469 F.3d at 635–636 (internal quotations and citations omitted).

Here, Watkins does not carry his burden of sufficiently documenting his indigency. Instead, he points to deposition and trial testimony about unstable employment and a lack of a full-time job. While he may well be indigent, the Seventh Circuit is clear that more documentation is necessary for the Court to make a finding that Watkins is unable to pay court-imposed costs at this time or in the future. Without "clear proof" of Watkins's financial circumstances, both currently and in the future, his potential indigency cannot overcome the presumption that Defendants are entitled to costs.

The Seventh Circuit has suggested that misconduct worthy of a penalty could include calling unnecessary witnesses or otherwise unnecessarily prolonging the proceedings. *See Congregation of the Passion*, 854 F.2d at 222. There is nothing before the Court suggesting that Defendants' unnecessarily prolonged this litigation or ran up the costs in this case through misconduct. Similarly, Defendants ordered the transcripts of the first trial on October 16, 2018, due to the mistrial and to prepare for the second trial and not in reaction to the discovery dispute or potential for sanctions. Thus, the trial transcripts are legitimate litigation costs sought by a prevailing party and are not solely tied to Defendants' discovery violations.

For the reasons discussed above, the Court finds that it would be inappropriate to require Watkins to pay the cost of Defendant Carter's deposition because, but-for

Defendants' discovery violations, his deposition likely would not have occurred, making costs related to him similar to those for calling an unnecessary witness. Defendants paid $331.10 for four deposition transcripts, one of which was Carter's. As such, the Court will deduct one-quarter of that expense, or $82.78, from Defendants' requested costs. Beyond the costs related to Carter's deposition, the remaining requested costs are entitled to the strong presumption that the losing party will pay the prevailing party's costs. Watkins fails to overcome that presumption. As such, the Court shall tax costs in favor of Defendants in the amount of $2,492.47.

## CONCLUSION

For the above-stated reasons, Plaintiff Tyrell Watkins's fee petition (Doc. 196) is **GRANTED in part** and **DENIED in part**. As a result of the sanction imposed herein, Watkins is awarded a total of $26,402.50 in attorneys' fees and $1,559.61 in costs and litigation expenses. Defendants, through their contested bill of costs (Doc. 203), are awarded costs in the amount of $2,492.47.

SO ORDERED.

Dated:  June 16, 2020.

Digitally signed
by Judge Sison
Date: 2020.06.16
12:30:24 -05'00'

_____
GILBERT C. SISON
United States Magistrate Judge